**WAL–MART STORES, INC., Appellant,**

v.

**Lorelle ITZ, Appellee.***

**No. 03–98–00632–CV.**

Court of Appeals of Texas, Austin.

April 6, 2000.

Rehearing Overruled May 25, 2000.

---

\* Documents in our record spell the party's name as both "Lorelle" and "Lorrelle." We

have used the former throughout, consistent with her second amended petition.

J. Preston Wrotenbery, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, P.L.L.C., Houston, for appellant.

Elizabeth G. Bloch, Hilgers & Watkins, P.C., Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices JONES and POWERS.[1]

MARILYN ABOUSSIE, Chief Justice.

Wal–Mart Stores, Inc. ("Wal–Mart") appeals from a money judgment recovered by former employee Lorelle Itz ("Itz") against Wal–Mart and its jewelry department manager A.C. Bordwell. Bordwell has not appealed. We will affirm the judgment.

Itz asserted against Bordwell and Wal–Mart certain common law causes of action together with statutory causes of action for sexual harassment under the Texas Human Rights Act.[2] Because Wal–Mart chal-

---

**1.** Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

**2.** *See* Tex. Lab.Code Ann. §§ 21.001, .051

lenges the legal and factual sufficiency of the evidence, we must detail the lengthy evidence relevant to its contentions. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). We will refer to additional evidence as necessary in addressing Wal–Mart's seven assignments of error.

## THE EVIDENCE

Ed Taber was manager of the south Austin Wal–Mart store; Kim Ghanem was his assistant and authorized to act as manager in Taber's absence.

A.C. Bordwell was manager of the jewelry department at the Wal–Mart store in south Austin and at one time also managed the photo-lab department there. Each was a "specialty department" within the store, meaning that each had a separate managerial hierarchy in addition to that of the store itself. The evidence was in conflict respecting Bordwell's authority to hire applicants and discharge employees in his departments. Several employees testified that Bordwell personally hired them after brief interviews; Ed Taber and personnel manager Colleen Griffin testified that Bordwell's authority extended only to recommending such actions while Taber possessed exclusive power to hire and discharge an employee at the south Austin Wal–Mart store.

Other Wal–Mart managers involved in this litigation include the following. Dolores Rodrigues was identified variously as a "support manager," "assistant manager," and "store personnel manager" at the south Austin Wal–Mart store. Donna Crocks was manager of the north Austin Wal–Mart store. Pat Curran was district manager for Wal–Mart stores in Austin.

Ray Phipps was district manager having authority over the jewelry departments of the Austin Wal–Mart stores; Donna Crocks replaced him in that capacity around January 1996.

Lorelle Itz worked under Bordwell's supervision and direction in the jewelry department at the south Austin Wal–Mart store. Amalia Longoria, Lyliana Cantu, and Jennifer Dowd were also employed at the south Austin Wal–Mart store.

Brenda Berg was a Wal–Mart customer who frequently shopped in the jewelry department at the south Austin Wal–Mart store.

### Amalia Longoria

Amalia Longoria testified as follows: Bordwell offered her employment, and she started to work for him in the jewelry department on April 27, 1995. Bordwell gave Longoria his home telephone number and invited her to call him; she never did. After Longoria started work, Bordwell frequently called her at home at night, asking her out and inquiring whether she needed money. At work, he hugged her several times in such a way that she could feel his "private parts" against her body. He commented on her body, said she looked "luscious" while licking his lips, offered her money, and brushed against her from behind. After working for Bordwell for three weeks, Longoria complained to Taber and was transferred to the toy department the next day.

Longoria again worked under Bordwell's supervision in September 1997 when she began working in the photo-lab depart-

(West 1996). The Texas statute is modeled on federal law with the objective of carrying out the purposes of Title VII of the Civil Rights Act of 1964, including its prohibition of discrimination on the basis of sex. *See* 42 U.S.C. §§ 2000e–2(a)(1), –5(f)(1) (1994); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Soto v. El Paso Nat. Gas Co.*, 942 S.W.2d 671, 677 (Tex. App.—El Paso 1997, writ denied); *Syndex Corp. v. Dean*, 820 S.W.2d 869, 871 (Tex.

App.—Austin 1991, writ denied). In considering actions under the Texas Human Rights Act, we may consider analogous provisions contained in Title VII and federal decisions construing and applying those provisions. *See Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Eckerdt v. Frostex Foods, Inc.*, 802 S.W.2d 70, 72 (Tex.App.—Austin 1990, no writ).

ment. He again told her she looked "luscious" while licking his lips, brushed against her from behind, and otherwise touched her in an inappropriate and offensive manner. In October 1997, as Longoria squatted to replace film boxes on a low shelf, Bordwell placed his foot between her legs and pressed against her "private parts," causing her to cry. Bordwell repeated the act the following day. Longoria complained to a Wal–Mart district manager with authority over the photo-lab, who told her to compose a written statement of what had happened. As Longoria was writing, a "co-manager" at the store pressured her to finish quickly and made fun of what she was writing. Longoria gave the statement to the "co-manager" who was in the "top management" at the south Austin store. Longoria later asked the store personnel manager for a copy of the statement, but he told her he did not have it and she would have to obtain a copy from Wal–Mart's "home office" where the statement had been sent. When Longoria called the home office, a female Wal–Mart employee named "Tony" informed Longoria the statement had been discarded or was "boxed up in receiving." Longoria never saw her statement again until she was given a copy at the time of trial.

### Lorelle Itz

Itz testified as follows: Bordwell, after a brief interview, hired her in December 1995 to work in the jewelry department. Between December 17 and December 21, Bordwell telephoned Itz at home each evening and asked if she and her boyfriend were going out. Itz told Bordwell he should not call her at home and hung up. On December 21, Itz's boyfriend told Bordwell not to call again unless it was business-related. Bordwell did not call again.

On December 18, 1995, Bordwell questioned Itz in a back room of the store regarding Wal–Mart's employee dress code. The two were seated close together facing each other in chairs Bordwell placed in that position. Bordwell told Itz that she had nice legs but needed to wear longer skirts to comply with the dress code. Bordwell "grabbed [her] skirt and took his hand" and "caressed" her from her "knee all the way down to [her] ankle," commenting that she had "nice legs" and "a nice body." Itz was "shocked" at his conduct and "scooted" her chair back. Bordwell left the room when someone else entered. Itz did not report the incident because Bordwell was her "boss" and she "didn't know what to do." Bordwell had not previously commented on her body or legs, "but he was always hovering around" her and following her.

A few days later, about December 21, 1995, Bordwell told Itz she should break up with her boyfriend and if she required an apartment, Bordwell would "set her up." Itz declined. When Taber was out of town, Itz talked to fellow employee Mary Edwards about Bordwell's conduct and how it made Itz feel uncomfortable at work. Edwards said "that something needed to be done." Itz told Edwards she felt her job might be in jeopardy but was not sure. On Edwards's advice, Itz spoke with assistant store manager Dolores Rodrigues. Rodrigues took Itz to an office and instructed Itz to compose a written statement explaining the situation. Rodrigues directed Itz not to come to work the next day, saying she would "cover [Itz's] shift" for that day. Kim Ghanem, another assistant store manager who was present, told Itz to compose a written statement but that if she wanted to continue to work at Wal–Mart, she would have to do so in the jewelry department. Itz wrote a statement, gave it to Rodrigues, and did not come to work the next working day.

Around Christmas, Bordwell gave Itz twenty dollars in cash, saying it was a Christmas bonus and that he had given others similar bonuses. Itz kept the money because she thought it was in fact a bonus.

Itz did not work from approximately January 6 to January 16, 1996, because she

was recovering from a miscarriage. The day she returned, Bordwell approached her in the jewelry department as she was serving customer Brenda Berg. Saying he "needed a hug," Bordwell gave Itz a "very forceful hug" lasting several seconds. "It was body-to-body." Itz and Bordwell were "touching forcefully against each other.... [H]is arms were around [her] waist, pulling [her] towards him" so she could not move. Berg observed the incident; Itz did not report it to anyone.

Later the same week, as Itz and Edwards were unpacking watches, Edwards admired a watch and commented, "Wouldn't it be nice to have a sugar daddy?" Itz "jokingly agreed." Bordwell overheard the remarks. Later that day, Bordwell asked Itz if he qualified to be her "sugar daddy." Bordwell purchased the watch and gave it to Itz the following day. Itz took the watch, did not say anything because there were customers around, and placed it by the jewelry counter. After about two days, she gave the watch to Taber.

On the day Bordwell gave her the watch, he again ordered Itz to the back room. He again placed two chairs no more than a foot and one-half apart. Itz and Bordwell sat down. He began asking about her family and her relationship with her boyfriend, saying "maybe it was better that [Itz] lost [her] baby because it wasn't meant for [the boyfriend and Itz] to be together." Bordwell told her she "looked good that day, that the dress [she] was wearing fit nicely on [her] and [her] black stockings ... looked very classy." He "then took the hem of [her] dress and brushed the back of his hand down it to tell [her] that was the appropriate length of the dress that [she] should be wearing." He brushed down from her knee to about half way down her leg. She "scooted" her chair back as she had done before and left the room.

About the same time, Bordwell bought Itz breakfast tacos after she told him she did not want any. He asked her if she

"wanted any money, honey" and inquired whether she and her boyfriend were living together; she replied it was none of his business.

Itz never invited any of Bordwell's conduct. As a result of his actions, she would get up in the morning and not want to go to work although she needed to do so. She was "emotional the whole time" she was at Wal–Mart, "trying to stay away from him and ... work the best [she] could." She successfully avoided Bordwell only when he was not at the store.

Itz first met Taber on January 25, 1996, when Itz, Edwards, Taber, and Itz's boyfriend met in one of the store's back rooms to discuss Itz's complaints against Bordwell. Taber asked Itz questions and recorded her answers. Before trial Itz reviewed Taber's notes from the meeting and affirmed that they accurately reflected his questions and her answers. The meeting lasted only ten minutes. Taber asked the questions "real fast" as if they were "questions that he had to ask. It was really brief." The questions covered all the complaints Itz had made against Bordwell. Itz asked Taber "for a transfer and he said he could try to do what he could, to try to get [her] one." Taber remarked "that Mr. Bordwell was not the kind of guy that would do something like that, those actions he would [sic] take." This remark made Itz "feel horrible" because she "had gone through all of this and then the store manager didn't believe" her. Itz did not know of any disciplinary action taken against Bordwell as a result of her complaints, but she did not think any action had been taken. Wal–Mart did nothing to respond to her complaints.

Itz had read an employee manual given to her when she entered Wal–Mart's employ. She believed that Bordwell's conduct, when he hugged her in the jewelry department, amounted to a "display of a romantic nature" forbidden by the manual. Bordwell's conduct made Itz uncomfortable in the workplace, which she believed

was also expressly forbidden by the manual. Taber did not discuss these policies with Itz in their meeting.

When no one from Wal–Mart contacted Itz about her complaints, she called Ray Phipps, the jewelry department district manager, and left a message on his answering machine, telling him she needed a transfer and "needed to talk to somebody that would do something at that store." She talked to Phipps around the first of February and told him she needed a transfer or "needed somebody to do something because [she] needed to work and ... did not want to work in [her current] environment." She told Phipps "everything that had gone on in that store" with Bordwell. Phipps later told Itz that he would set up a meeting for Monday night, February 5, 1996, with Phipps, Pat Curran, Donna Crocks, and Itz. Around four or five o'clock the afternoon of February 5, Phipps left a message on Itz's answering machine that the meeting had been cancelled and that Itz should go see Donna Crocks at the north Austin Wal–Mart store.

Before the meeting was cancelled, Itz had engaged an attorney, Paul Morin, to attend the meeting with her. After it was cancelled, Morin sent a "fax" letter to Phipps asking, on Itz's behalf, for a transfer. Morin never received a response.

Itz never attempted to see Crocks because Itz felt she was getting the "runaround." She never received any communication from Crocks or Curran asking her to come in and talk. Itz tried to obtain copies of her written statements from Taber, but he told her she "needed to get a subpoena to get them."

Itz was never told the results of Taber's investigation of her complaints. She knew nothing of a meeting between her boyfriend and Taber on January 27; her boyfriend never told her about it. Itz never contacted anyone at Wal–Mart after Morin sent a second letter to Pat Curran requesting a transfer. Itz left Austin and went to work in Corpus Christi.

### Donna Berg

Donna Berg, a frequent Wal–Mart customer, testified as follows: She was talking to Mary Edwards in the jewelry department at the south Austin store and heard Bordwell say to Itz, "I need a hug." Berg saw Bordwell hug Itz so that their chests, waists, and legs were in contact. Berg worried about the episode and discussed it with Edwards. Berg told Taber about the episode two weeks after it happened. Taber told Berg he would take care of it.

### Mary Edwards

Mary Edwards testified as follows: She worked under Bordwell in the jewelry department. Soon after Itz came to work in the department, Edwards noticed Itz became "sadder and sadder" each day and ultimately "very depressed." Itz told Edwards about Bordwell's actions, crying as she did so. Edwards told Itz to talk to Dolores Rodrigues, an assistant manager at the store, whom Edwards then paged on the store intercom. Rodrigues came to the jewelry department and took Itz into Taber's office while he was absent. Itz related to Rodrigues the particulars of Bordwell's conduct when he rubbed her leg. Rodrigues told Itz to go to a back room and compose a written statement. Kim Ghanem, an assistant manager, and "Joe," a support manager, were present as Itz described Bordwell's conduct and composed her statement.

About four days later, Edwards, Itz, and Rodrigues met with Taber in his office. Taber told Itz to compose a written statement relating the times, dates, and incidents with Bordwell. Edwards knew Itz had already given Rodrigues a written statement. Itz composed the second statement and gave it to someone at Wal–Mart who was unknown to Edwards.

Edwards was present at a subsequent meeting in Taber's office with Rodrigues, Itz, and Taber. Bordwell had given Itz a

watch in the interim. Itz gave the watch to Taber, saying it was a gift from Bordwell that Itz did not want. Taber said the only thing he could do was put the watch in his safe and that he would talk to Bordwell. Nothing further transpired.

Later, Itz came to Edwards and said Bordwell had given her a ten-dollar bill. She and Itz went to Taber's office and gave him the money. Taber said, "Well, what would you like for me to do with it?" Itz replied that "she didn't really care, that she didn't want it." Itz laid the bill on Taber's desk, and he said he would put it in his safe. According to Edwards, Taber "acted like it was no big deal" and said he would speak to Bordwell.

Sometime after the second meeting, Taber asked Edwards if, "in the situation with" Bordwell, Itz was confusing matters with Itz's grandfather who had sexually abused Itz as a child. Edwards stated Itz "knew very well what a good touch and what a bad touch was," and when Bordwell "touched her leg and stuff . . . that was a very bad touch." Taber said he would check into it. Kim Ghanem also asked Edwards whether Itz was getting upset with Bordwell because of her experience with her grandfather. Edwards replied she did not think so.

Edwards confirmed the hugging incident and Berg's presence. Edwards heard Bordwell tell Itz that she fit her dress very well, had very good-looking legs, needed to get rid of her boyfriend, and Itz's "miscarriage was meant for the best because of the situation with her boyfriend." Itz started crying, left the jewelry department, and began cleaning glass fixtures.

Edwards testified that Bordwell frequently made inappropriate comments about female customers within hearing of jewelry department employees, such as, "Wow, she is good looking." Sometimes he made jokes about unattractive women, particularly heavy-set women. Bordwell "would say things like 'You would have to roll her in flour to find it' and 'she would look nice if she would lose some weight,' and things like that."

Itz lived in Edwards's apartment for two months after Itz left Wal–Mart's employ. During that period, Itz slept very little and would hardly eat. Edwards would "try to force her to eat because she was just making herself sick." Itz suffered from headaches and stomach cramps, and Edwards "would wake up in the middle of the night and hear [Itz] throwing up." While Itz was living with Edwards, no one visited Itz at the apartment, although her mother and father called frequently; Itz left the apartment only once, to wash her car. Itz told Edwards "she just didn't want to face people and that she was really concerned about getting around other people." Itz told Edwards "that [Bordwell's conduct] was something that she would probably never forget and that she was just very, very hurt about it." Itz said "that it would be kind of hard for her to ever trust another gentleman because she didn't really understand why that happened to her."

Itz left Edwards's apartment and moved to Corpus Christi. The two contacted each other about once a month after that. Edwards could tell Itz was not the same "sweet and bubbly" person she was when they first met. Even at the time of trial, Itz was not very happy and was still "going through a stage where she doesn't know who to trust, to talk to." Itz's depression at trial was very similar to what Edwards observed during the two months they lived together.

Edwards was asked whether she found a need to defend Itz and to confront Bordwell about his offensive conduct. Edwards replied, "I was told [by Taber] not to [say anything]." In addition, "[t]he support team managers, everyone told me not to speak to anyone about the situation" after Itz "reported it to management." Edwards admitted that while they lived together, Itz related that her grandfather was thirty to sixty days from getting out of prison and had threatened to kill her when he was released. In Edwards's opinion,

Itz was scared but not depressed by those facts; Edwards was sure that only Bordwell's conduct caused Itz's depression.

### Lyliana Cantu

Lyliana Cantu testified that she began working in the Wal–Mart jewelry department on May 1, 1996. After one week, Bordwell asked her out to eat. He told her that she looked nice, that she should leave her husband, and that he would move in and care for her. Bordwell told Cantu he thought of her when he went to bed at night and wondered what positions she liked in bed; he "tingled" when he thought of her. Bordwell told Cantu "[h]e would work [her] little butt out three times a night if [she] wanted to work nights." After three weeks, Bordwell took Cantu to a back room, offered her money, licked his lips, and said she looked nice. He once squeezed her arm. Cantu reported these incidents to Taber and Ghanem.

### Jennifer Dowd

Jennifer Dowd testified she worked for Bordwell in the Wal–Mart photo-lab in September 1997. At least once a day, he would brush against her from behind. He sometimes took her arm and pulled her close. He once rubbed his finger in the middle of her hand. Dowd gave Taber a written statement complaining of Bordwell's conduct.

### A.C. Bordwell

Bordwell testified as follows: He never had any problems with Longoria. He never offered her money, called her at home at night, asked her out to eat, hugged her, told her she had a good figure, told her she was "luscious," licked his lips in her presence, rubbed against her, grabbed her arm, or placed his foot against her "private parts."

Bordwell testified that he once gave Cantu ten dollars for lunch. He never offered to put her up in an apartment, suggested she get a divorce, met with her in a back room, or said she was beautiful.

Cantu left Wal–Mart's employ because of marital problems. Bordwell testified that he never got close to Dowd, touched her, or said she was pretty.

Bordwell testified that he never said Itz was pretty and never said anything about her legs. He was alone with Itz in a back room only once when he talked to her about missing work on January 22, 1996 (the date Rodrigues told Itz to remain at home after composing her written statement). Bordwell testified he never called Itz at home and never talked to Itz's boyfriend except on one occasion when the boyfriend called Itz at work and Bordwell agreed to tell her that he had called. In hugging Itz at the jewelry counter, Bordwell intended only to comfort her following her miscarriage. "It certainly wasn't planned, but I would expect with most people a hug is sort of a wrap around by the shoulder area ... and back." He absolutely did not, in the course of that hug, "press any part of [his] body against any part of [her] body." He did not pull her toward and against him. Their upper chest areas could have touched. Itz did not react, and Bordwell did not expect or want a reaction. "I wanted to convey my feelings," he testified. He did not see Berg observing the incident and did not know whether the hug was unwelcome.

Bordwell initially testified that he never overheard the "sugar daddy" remark and never asked Itz if he could be her "sugar daddy." Later in his testimony, Bordwell recollected that he did hear the "sugar daddy" remark but said it was a remark that Mary Edwards made to herself, not to Itz. Bordwell maintained that he never asked Itz if he could be her "sugar daddy." Bordwell admitted giving Itz ten dollars for lunch, the watch, and a twenty-dollar cash bonus at Christmas.

Taber once asked Bordwell if he had sexually harassed Itz, and Bordwell replied that he had not. Bordwell admitted testifying on deposition, however, that he had never been questioned or interviewed

by anyone regarding Itz's complaints. No one ever told Bordwell the result of any investigation into the complaints. He agreed, however, that the conduct Itz attributed to him amounted to "sexual harassment" within the meaning of that term as used in the Wal–Mart employee manual; he admitted that Wal–Mart had an obligation to investigate Itz's complaints.

### Ed Taber

Ed Taber testified as follows: He "answered to" Pat Curran, a Wal–Mart district manager. At the beginning of 1996, Donna Crocks succeeded Ray Phipps as district manager of the jewelry department at the south Austin Wal–Mart store. The jewelry and photo-lab departments were "specialty departments" managed by Phipps and then Crocks. Bordwell was "head" of these two departments.

Taber testified Longoria asked for a transfer from Bordwell's department in May 1995 because of problems with the work hours, not because he was "coming on" to her. She never made sexual complaints about Bordwell or complained about his calling her at home at night. This remained true at the time of trial— Taber knew nothing about a sexual harassment complaint by Longoria. No one had filed a sexual harassment complaint against Bordwell before Itz.

Kim Ghanem, an assistant manager, ran the south Austin Wal–Mart store in January 1996 while Taber was in Kansas City. Taber first learned about Itz's complaint from Ghanem when Taber returned on January 24. Taber interviewed Itz on January 25 in his office; her boyfriend was present. Taber's notes of the meeting were introduced in evidence.

Brenda Berg, a Wal–Mart customer, came to the store to see Taber. She talked to him about the hugging incident at the jewelry counter. Taber believed Berg when she said the hug bothered Itz very much. Taber admitted that Bordwell's conduct, if it actually happened, constituted sexual harassment within the meaning of that term in the Wal–Mart employee manual.

On January 26, the day following Taber's interview with Itz and her boyfriend, Taber went to see Curran to discuss Itz's complaint. They decided that they did not have enough facts but concluded, nevertheless, that there was no wrongdoing on Bordwell's part. Taber had interviewed Bordwell the preceding day. Bordwell told Taber that he had taken Itz into a back room twice—once to talk about her boyfriend and once about the dress code. According to Taber's interview notes, an employee named "Bennie" asked Bordwell if he had offered to be Itz's "sugar daddy." Bordwell related this fact to Taber. Taber's notes were incomplete because he did not write down several of Bordwell's responses to his questions.

Taber telephoned Donna Crocks, who agreed to transfer Itz to another Wal–Mart store. Taber never communicated that fact to Itz but instead told her boyfriend when he came to the store. Taber never told Itz the results of his investigation. Taber was not aware of any other proposed meeting with Itz in February and knew nothing about a meeting being set and canceled by Ray Phipps. Taber's sole purpose in calling Itz to set up a meeting on a Saturday, the day her boyfriend showed up alone, was to tell Itz that Taber found no merit in her complaint. Taber interviewed Edwards about Itz's complaint. Edwards's report confirmed what Itz had told Taber.

Until his deposition in the present litigation, Taber never saw the letter from Itz's lawyer to Curran requesting a transfer. Taber agreed in his testimony, however, that this letter was Itz's response to Taber's request that she "get back" with Taber. Taber never attempted to provide Itz a copy of her statement after she asked for it.

Ghanem was one of five or six assistant store managers at the south Austin store.

Assistant managers are "considered to be a member of management" at Wal–Mart. They are salaried employees as compared to hourly-wage employees such as Bordwell.

## Colleen Griffin

Colleen Griffin testified she came to work at Wal–Mart in August 1994 and became personnel manager in October 1994, a position she held until May 1996. Bordwell was her training coordinator in 1994. According to Griffin, only store managers such as Taber had authority to hire applicants and discharge employees.

As a specialty department, the jewelry department at the south Austin store was not under Griffin's supervision. A "specialty department" is operated under a profit-sharing arrangement between Wal–Mart and a manufacturer, such as a jewelry manufacturer, who leases space from Wal–Mart. The photo-lab department was also a specialty department under an arrangement with "Fuji Film." The extent of Bordwell's authority as manager of the jewelry department and photo lab is uncertain from Griffin's testimony. In any event, Wal–Mart's regulations apply to jewelry department employees. Griffin testified that sexual harassment complaints are kept in a separate personnel file at the south Austin store; the personnel manager is authorized to make copies of the contents.

## THE VERDICT AND JUDGMENT

We summarize the jury's verdict as follows:

Question No. 1. Bordwell subjected Itz to quid-pro-quo sexual harassment, proximately causing her injury.

Question No. 2. Bordwell subjected Itz to hostile-work-environment sexual harassment, proximately causing her injury.

. . . .

Question No. 4. Wal–Mart constructively discharged Itz from her employment at Wal–Mart, proximately causing her injury.

Question No. 5. Bordwell intentionally and knowingly caused physical contact with Itz when he knew or should have reasonably believed she would regard the contact as offensive or provocative, proximately causing her injury.

Question No. 6. Bordwell invaded Itz's privacy, proximately causing her injury.

. . . .

Question No. 9. The following sums would fairly and reasonably compensate Itz for her injuries.

Psychological-care expenses that Itz will, in reasonable probability, incur in the future: $1,500.00.

Past mental anguish: $50,000.00.

Mental Anguish that Itz will, in reasonable probability, sustain in the future: $10,000.00.

Past lost wages: $2,765.75.

Loss of future earning capacity that Itz will, in reasonable probability, sustain in the future: –0–.

Question No. 10. By clear and convincing evidence, Wal–Mart acted with malice or reckless indifference toward Itz's rights with respect to the conduct found in answer to Questions 1, 2, and 4.

. . . .

Question No. 13. By clear and convincing evidence, Wal–Mart ratified Bordwell's actions in intentionally or knowingly causing physical contact with Itz, as found in answer to Question No. 5.

Question No. 14. A reasonable and necessary attorney's fee for Itz in the present case is $122,058.75.

Question No. 15. The sum of $150,000 should be assessed against Wal–Mart as exemplary damages for Wal–Mart's conduct found in Question Number 10.

The trial court rendered judgment on the verdict against Bordwell and Wal–Mart jointly and severally for $1,500 for future psychological care, $50,000 for past mental anguish, $10,000 for future mental anguish, and $2,765.75 for back pay; rendered judgment against Wal–Mart for $13,064.43 in pre-judgment interest, $122,058.75 in attorney's fees, $5,000 for expert witness expense, and $150,000 in punitive damages; and awarded Itz court costs and post-judgment interest.

## ASSIGNMENTS OF ERROR

In its appeal, Wal–Mart contends the evidence is legally and factually insufficient to support the jury's findings of (1) quid-pro-quo sexual harassment, (2) hostile-work-environment sexual harassment, (3) constructive discharge, (4) exemplary damages, (5) damages for mental anguish, (6) Wal–Mart's ratification of Bordwell's assault upon Itz, and (7) attorneys' fees. We will discuss the assignments of error under these headings.[3] Within its complaints, Wal–Mart has added several contentions that would entitle it to judgment as a matter of law for other reasons; we will discuss these where raised.

## QUID–PRO–QUO SEXUAL–HARASSMENT

■■■ Under Title VII and the Texas Human Rights Act, an employer may be held vicariously liable for quid-pro-quo sexual harassment by its supervisor. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Ewald v. Wornick Family Foods Corp.*, 878 S.W.2d 653, 659 (Tex. App.—Corpus Christi 1994, writ denied). The elements of the cause of action are as follows: (1) A supervisor (2) because of sex

(3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship. *See Ellerth*, 524 U.S. at 752–54, 118 S.Ct. 2257; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Ewald*, 878 S.W.2d at 659. An employer's liability in such cases derives from the law of agency. Because discriminatory conduct ordinarily lies outside the agent's scope of authority, for a principal to be held liable it must be shown that the agency relationship aided the supervisor in committing the discriminatory act. *See Burlington Indus.*, 524 U.S. at 759–60, 118 S.Ct. 2257. The cause of action requires proof with respect to a tangible aspect of the employment relationship, so that "the injury could not have been inflicted absent the agency relationship" such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761–62, 118 S.Ct. 2257.

■■■ Wal–Mart initially contends that Itz failed to plead a cause of action for quid-pro-quo sexual harassment because she did not allege all the requisite elements. We disagree. It was only necessary that Itz state a "cause of action" in "plain and concise language." Tex.R. Civ. P. 45. A plaintiff states a cause of action sufficiently "by setting forth a sequence of occurrences that, if established, will demonstrate" a legal or equitable right of the plaintiff has been violated by the defendant either "personally or through one for whom the defendant is responsible," and when required by the substantive law, a statement that the "plaintiff suffered a resultant loss." 2 *Texas Civil Practice* § 8.24, at 215 (Diane M. Allen et al. eds., 1992 ed.). The court should uphold the

---

**3.** In considering the legal sufficiency of the evidence, we may assess only the evidence and inferences therefrom that tend to support the jury findings, disregarding all contrary evidence and inferences. *See Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). If any evidence exists to support the finding, the finding will be sustained. *See Southern States*

*Trans., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). In considering the factual sufficiency of the evidence, we must assess all the evidence in the record and may overturn a jury finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

petition where a cause of action may reasonably be inferred from what is specifically stated therein, even if an element of the action is not specifically alleged. *See SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 354–55 (Tex.1995).

■ In Itz's Second Amended Original Petition, she alleged that Bordwell was her supervisor and that she was an employee in the Wal–Mart jewelry department of which he was "manager." The petition described at length Bordwell's "unwelcome sexual advances," including "touching of a sexual nature ... on her knee, leg, calf, and ... inappropriately [putting] his arms around her." Concerning the effect such conduct had upon a tangible aspect of the employment relationship, Itz alleged facts pertaining to the conduct of Bordwell and Wal–Mart's "Store Manager" who failed to protect her even after she reported such conduct to the "Store Manager." When Itz received no response to her requests for a transfer, she was constructively discharged because she was given no alternative but to continue working under Bordwell's supervision. We hold these allegations, among many others in Itz's petition, sufficiently alleged a cause of action for quid-pro-quo sexual harassment. We turn then to Wal–Mart's alternate contentions.

■ Itz's cause of action for quid-pro-quo sexual harassment was submitted to the jury as Question No. One. The question instructed the jury as follows:

Sexual harassment occurred if:

(1) Lorelle Itz was subjected to unwelcome sexual advance(s) or demand(s); and

(2) Lorelle Itz's submission to the unwelcome advance(s) or demand(s) was an express or implied condition for receiving job benefits or Lorelle Itz's refusal to submit to the sexual advance(s) or demand(s) resulted in an actual job detriment;

(3) the conduct was committed by an employee who had authority over hiring, advancement, dismissals, discipline, or other employment decisions affecting Lorrelle [sic] Itz; and

(4) a supervisory employee of Wal–Mart knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment.

Wal–Mart contends as a matter of law that the evidence did not justify submitting this cause of action to the jury.

■ Each question properly submitted to the jury must be raised by the evidence. *See* Tex.R. Civ. P. 278. Whether a question is raised by the evidence depends upon whether reasonable minds may differ as to the inferences to be drawn from undisputed facts or whether there is a conflict in the evidence. *See* 4 *Texas Civil Practice* § 22.18, at 196.

The instruction explains that sexual harassment occurred if Itz was subjected to unwelcome *sexual advances or demands*. Wal–Mart argues there was no evidence Bordwell made "sexual demands." While we view the evidence as easily permitting a reasonable inference that Bordwell made implicit sexual demands, the evidence directly showed he made "sexual advances."

Itz's evidence revealed Bordwell's rude and puerile behavior toward her. In addition, she testified that on business pretexts Bordwell took her into a back room where no one else was present and physically "caressed" her leg from the knee to the ankle, held the hem of her skirt, and brushed his hand down her leg. She testified that he offered to "set her up" in an apartment if she would leave her boyfriend; he hugged her in an inappropriate and unwelcome manner; he asked whether she wanted any money and if he could be her "sugar daddy"; and he persistently telephoned her at night regarding personal matters. Although Bordwell denied all these actions except for a "comforting hug" after her miscarriage, Bordwell and Taber both admitted that the conduct, *if* it

occurred, would constitute "sexual harassment" under Wal–Mart's written policy. We conclude the foregoing evidence would permit the jury reasonably to infer that Bordwell made "sexual advances" toward Itz. Consequently, we hold the evidence is legally and factually sufficient to sustain that element of Itz's cause of action.

Wal–Mart next complains that the evidence is legally and factually insufficient to support the finding in Question No. One that Itz's refusal to submit to the sexual advances or demands resulted in an actual job detriment. A constructive discharge constitutes such a detriment as a matter of law. See Burlington Indus., 524 U.S. at 761–62, 118 S.Ct. 2257. Because we hold below that the evidence is legally and factually sufficient to support the jury's finding that Itz was constructively discharged, we hold the evidence is legally and factually sufficient to support the jury's finding that Itz's refusal to submit to Bordwell's sexual advances resulted in an actual job detriment.

## HOSTILE–WORK–ENVIRONMENT SEXUAL–HARASSMENT

A hostile-work-environment claim of sexual harassment against an employer may result from the conduct of the plaintiff's co-employees. Here, however, Itz seeks to hold Wal–Mart liable on such a claim based on the conduct of a supervisor. See generally, Jason B. Binimow, When Is Supervisor's Hostile Environment Sexual Harassment Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.) Imputable to Employer, 157 A.L.R. Fed. 1 (1999); Richelle Wise Kidder, A Conciliatory Approach to Workplace Harassment: Burlington Industries, Inc. v. Ellerth and Faragher v. City of Boca Raton, 36 Hous. L.Rev. 1315 (1999).

The elements of the cause of action are as follows: (1) A supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct (5) that is severe and pervasive, (6) creates an abusive work environment, and (7) affects a term, condition, or privilege of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 780, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Vinson, 477 U.S. at 67, 106 S.Ct. 2399; Soto v. El Paso Nat. Gas Co., 942 S.W.2d 671, 678–80 (Tex. App.—El Paso 1997, writ denied). A supervisor's conduct may be imputed to his employer either because the supervisor was directly responsible for the harassment or because the supervisor failed to act to abate sexual harassment by others after learning of it. See Faragher, 524 U.S. at 808, 118 S.Ct. 2275; Coates v. Sundor Brands, Inc., 160 F.3d 688, 693 (11th Cir.1998); Soto, 942 S.W.2d at 678; Ewald, 878 S.W.2d at 659.

Certain factors can be considered in assessing whether a work environment is hostile or abusive: the frequency and severity of the abusive conduct, whether the conduct was physically threatening or humiliating, and whether the conduct unreasonably interfered with the plaintiff's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The jury may determine from all the circumstances whether "a reasonable person would find [the environment] hostile or abusive," provided the plaintiff personally and subjectively perceived the environment to be abusive. A showing of "tangible psychological injury" is not required: "Title VII comes into play before the harassing conduct leads to a nervous breakdown." Id. at 21, 114 S.Ct. 367.

An employer may avoid liability by pleading and proving as an affirmative defense that it had a policy in place to prevent or correct sexual harassment and that plaintiff unreasonably failed to take advantage of it. See Faragher, 524 U.S. at 806–07, 118 S.Ct. 2275. Wal–Mart did not plead the affirmative defense. See Tex.R. Civ. P. 94. The defense is not available when the harassment results in tangible

employment action "such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275. Owing to Itz's constructive discharge, the defense is not available to Wal–Mart in this instance.

▆ Question No. Two submitted to the jury Itz's cause of action for hostile-work-environment sexual harassment. The question instructed the jury as follows:

To establish a claim for a hostile work environment, Lorrelle [sic] Itz must show:

(1) Lorrelle [sic] Itz was subjected to sexual advances, requests for sexual favors, and/or conduct of a sexual nature that was unwelcome, undesirable, and offensive to her;

(2) the harassment complained of was based upon gender;

(3) the harassment affected a term, condition or privilege of her employment; and

(4) a supervisory employee of Wal–Mart knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment.

Harassment alters a term, condition or privilege of employment when a reasonable person would find that the harassment created an abusive working environment. In determining whether an abusive working environment existed, you may consider the following: the frequency of the conduct; its severity; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*See Garcia v. Schwab & Valley Mortgage Co.*, 967 S.W.2d 883, 885–86 (Tex.App.—Corpus Christi 1998, no pet.); *Syndex Corp. v. Dean*, 820 S.W.2d 869, 871 (Tex.App.—Austin 1991, writ denied). "The critical inquiry is the *environment*; evidence of general work atmosphere as well as specific instances of hostility or abuse are important[;] ... [h]arassment directed at other members of the same protected group is relevant to show a hostile environment[;]" and "[s]ingle incidents should not be viewed in isolation [because] it is the cumulative effect of offensive behavior which creates the work environment." *Soto*, 942 S.W.2d at 678.

▆ Wal–Mart contends the evidence is legally and factually insufficient to support a finding that Bordwell's conduct adversely affected a term, condition, or privilege of Itz's employment. Wal–Mart argues that the evidence does not show Bordwell made explicit sexual demands of Itz or that and she was threatened with a "tangible job detriment," such as a negative employment evaluation or a denial of an equal opportunity in the workplace, if she refused to accede to those demands. Indeed, Wal–Mart was willing to re-hire Itz even after she quit.

▆ We disagree with Wal–Mart's contention that the evidence fails to show an adverse effect on a term, condition, or privilege of Itz's employment. Discriminatory intimidation, ridicule, and insult, when sufficiently severe and pervasive, may be adequate to show a workplace environment adversely affecting a term, condition, or privilege of employment; it is not necessary to demonstrate an adverse *economic* effect. *See Vinson*, 477 U.S. at 64, 106 S.Ct. 2399. The plaintiff need not show a tangible psychological injury; something less may be sufficient when combined with all other circumstances. *See Harris*, 510 U.S. at 22–23, 114 S.Ct. 367.

The testimony of Longoria, Cantu, and Dowd showed Bordwell repeatedly subjected female employees to what may reasonably be viewed as an abusive work environment. Itz's testimony demonstrated that Bordwell subjected her to several instances of humiliating conduct, resulting in tangible psychological injury and interfering with her work performance. We will refer to these matters below in our

discussion of constructive discharge. The evidence is undisputed that Itz personally perceived her work environment to be hostile because of Bordwell's conduct. We hold that a reasonable jury could find that Itz was subjected to a hostile and abusive work environment as instructed in Question No. Two.

Finally, Wal–Mart advances several arguments pertaining to the jury's finding that a supervisory employee of Wal–Mart knew or should have known of the harassment and failed to take prompt remedial action to end it as required by Question No. Two. As explained earlier, harassing conduct is imputable to an employer either because the supervisor was directly responsible for the harassment *or* because a supervisor failed to act to abate another's harassing conduct after learning of it. Here, Taber is the "supervisory employee" in question.

▮ Wal–Mart first contends that it was "entitled to judgment as a matter of law" on the issue of whether Taber knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment; alternatively, Wal–Mart contends the jury's finding on that issue is unsupported by legally and factually sufficient evidence.

Wal–Mart points to evidence that Taber undertook an investigation of Itz's complaint and was willing to transfer her from Bordwell's supervision. The jury was free to believe opposing evidence that Itz was never informed of Wal–Mart's willingness to transfer her.

The record includes Taber's testimony describing his investigation. He talked to Itz, Bordwell, and two other employees. In the end, Taber "didn't feel like [he] had enough facts" upon which to make a conclusion of any kind. Nevertheless, he concluded "there was no wrongdoing on the part of A.C. Bordwell." This response is not the "prompt remedial action" contemplated by the instruction, which presup-

poses that sexual harassment or some lesser form of "wrongdoing" *has* been established and that a supervisory employee has taken some action reasonably calculated to end it commensurate with the seriousness of the conduct. *See Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794 (5th Cir. 1994); *Mitchell v. Texas Dep't of Ins.,* 963 S.W.2d 935, 940 (Tex.App.—Austin 1998, no pet.). The substance of Taber's testimony is that he concluded Bordwell had *not* committed sexual harassment or any kind of wrongdoing—a conclusion that necessarily eliminates the need for *remedial* action by "a supervisory employee."

Moreover, the jury could reasonably infer from the evidence that Taber's investigation was pretextual, or at least insufficient, given the gravity of Itz's allegations. The undisputed evidence reveals that Itz's complaint was objectively corroborated by Taber's possession of the watch and ten-dollar bill and by the extraordinary fact that Berg, a disinterested *customer,* personally observed one episode of which Itz had complained and independently reported it to Taber. Longoria complained to Taber about Bordwell's conduct before Itz made her complaint. A jury might reasonably conclude that even Taber's brief investigation should have resulted in a word of advice, caution, or reprimand to Bordwell. Nevertheless, Taber never reported to Bordwell or Itz any result of the investigation. Itz's testimony that Taber told her to get a subpoena if she wanted to obtain copies of her written statements might reasonably be viewed as indicating bias, malice, or hostility on his part. In addition, only a few weeks after Itz's complaints, Cantu reported to Taber a third series of sexual harassment incidents committed by Bordwell, which might have caused a reasonable person in Taber's position to reassess Itz's complaint and to interview Bordwell again.

We conclude that, after weighing all the evidence and determining credibility, the jury could reasonably find as it did in answer to Question No. Two.

## CONSTRUCTIVE DISCHARGE

A constructive discharge constitutes a detriment to a term, condition, or privilege of employment as a matter of law. *See Burlington Indus.*, 524 U.S. at 761–62, 118 S.Ct. 2257. Wal–Mart does not argue to the contrary. Wal–Mart does contend, however, that the evidence is legally and factually insufficient to support the jury's answer to Question No. Four finding that Wal–Mart constructively discharged Itz, proximately causing her injury.

Question No. Four contained the following instruction: "A 'constructive discharge' means when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *See Davila v. Lockwood*, 933 S.W.2d 628, 630 (Tex.App.— Corpus Christi 1996, no writ); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 177 (Tex.App.—Houston [14th Dist.] 1991, no writ).

Wal–Mart first argues that Itz was unreasonable as a matter of law in leaving Wal–Mart's employ because Wal–Mart was ready and willing to transfer her to a position free from Bordwell's supervision.

Itz testified that she did not know of Taber's meeting with her boyfriend at which Taber said he would transfer Itz and she was never told anything Taber said at the meeting. When she did not hear from anyone at Wal–Mart about her complaints concerning Bordwell, Itz telephoned Phipps and asked him for a transfer from the jewelry department, stating she did not want to work there under Bordwell. Phipps set up a meeting to discuss her complaints and request for transfer but cancelled the meeting, leaving Itz a message that if she "wanted to talk to somebody, [Itz] could go to the north store and talk to Donna [Crocks] either the next morning or a couple of days later."

Itz's attorney "faxed" Phipps a letter requesting a transfer but received no reply. Itz was never informed of the results of any investigation by Wal–Mart and knew of nothing Wal–Mart did to respond to her complaints. Because of these events, Itz believed she was getting the "run around" from Wal–Mart. When she requested copies of her statements, Taber told her she would need a subpoena. She then left Wal–Mart's employ. We conclude this evidence permitted a jury reasonably to infer that Wal–Mart's offer of a transfer was never communicated to Itz, if indeed it was communicated to her boyfriend.

Wal–Mart next contends that the circumstances shown by the evidence were not, as a matter of law, "so intolerable that a reasonable employee would feel compelled to resign." In this connection Wal–Mart argues, "[i]t is, notably, 'part of an employee's obligation . . . not to assume the worst, and not to jump to conclusions too fast,'" quoting from the opinion in *Webb v. Cardiothoracic Surgery Associates*, 139 F.3d 532, 539 (5th Cir.1998).

After receiving actual or constructive notice of a sexual harassment complaint, an employer must be given sufficient time to remedy the situation by actions reasonably calculated to prevent further harassment before a constructive discharge may be found. *See Knabe v. Boury Corp.*, 114 F.3d 407, 414 (3d Cir. 1997); *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir.1996). We note that Taber himself testified he *completed* his investigation the day after receiving Itz's complaint and concluded no wrongdoing by Bordwell. The jury could reasonably infer that Taber, not Itz, "jump[ed] to conclusions too fast."

We turn then to Wal–Mart's view that the evidence did not show circumstances "so intolerable that a reasonable employee would feel compelled to resign."

The evidence reveals the emotional effects of Bordwell's conduct on Itz. Itz and Edwards testified regarding Itz's poor

emotional state at work and at home, which Itz attributed to Bordwell's conduct; Itz feared losing her job; she cried at work and could not sleep at night; she feared Bordwell and avoided him; she could not eat properly; she vomited; she feared taking a break and feared reporting Bordwell's conduct to Taber because she believed the two were friends. Itz got "sadder and sadder" at work each day "like she didn't really want to come to work"; she became very depressed. The results of the investigation were never reported to her, and she received no answer to her transfer requests.

A psychologist testified, based on his testing and counseling of Itz, that she

had an affective disorder, which means depression, anxiety and phobias, and ... these exceeded the rate that you would find ... in the normal population. She had more of those attributes than 95 percent of the population in the United States [and]

. . . .

in the reasonable degree of psychological probability, the anxiety, depression and phobias were caused or exacerbated by the sexual harassment episodes in the workplace [that Itz attributed to Bordwell].

We hold that a jury could find from the evidence that Itz acted reasonably in resigning under these circumstances. We therefore overrule Wal–Mart's contention that Itz acted unreasonably as a matter of law.

### EXEMPLARY DAMAGES

Wal–Mart contends the evidence is legally and factually insufficient to support the verdict of $150,000 in exemplary damages.

Question No. Ten asked and instructed the jury as follows:

Do you find, by clear and convincing evidence, that Wal–Mart Stores, Inc. engaged in any of the conduct you have found in Question Nos. 1, 2, 3, or 4 with malice or with reckless indifference toward the rights of Lorelle Itz?

You are instructed that "malice" means either:

(a) conduct specifically intended by Wal–Mart to cause Lorrelle [sic] Itz substantial injury; or

(b) an act carried out by Wal–Mart

(1) which, when viewed objectively from the standpoint of Wal–Mart at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Lorrelle [sic] Itz; and,

(2) of which Wal–Mart had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Lorrelle [sic] Itz.

You are instructed that "clear and convincing evidence" means the measure or degree of proof that produces in your mind a firm belief or conviction as to the truth of the matter sought to be established.

You are instructed that to find that Wal–Mart acted with malice, you must find that the employee who committed the malicious act was acting as a "vice principal" of Wal–Mart and was acting within the course and scope of his or her employment.

A person acts "recklessly" if he knows or should know that there is a strong probability that harm may result.

A "vice principal" of a corporation is a person who has the authority to hire, discharge, and direct the employees of the corporation, or who has the authority to manage the entire corporation or a department or division of its business.

You are instructed that "course and scope" means that the employee committing the act was acting within the scope of his general authority and the act was in furtherance of Wal–Mart's business

and for the accomplishment of the object for which the employee was hired.

The following additional instruction was given in the initial part of the charge:

> When a corporation is involved, of course, it may act only through natural persons as its agents or employees; and in general, any agent or employee of a corporation may bind the corporation by his acts and declarations made while acting within the scope of his authority delegated to him by the corporation, or within the scope of his duties as an employee of the corporation.

In response to Question No. Ten, the jury found by clear and convincing evidence that Wal–Mart acted with malice or reckless indifference toward Itz's rights in connection with her claims for quid-pro-quo sexual harassment, hostile-work-environment sexual harassment, and constructive discharge. In response to Question No. Fifteen, the jury assessed $150,000 against Wal–Mart as exemplary damages for its conduct.

### Whether Bordwell was shown to be a "Vice Principal"[4]

 Wal–Mart contends the evidence is factually and legally insufficient to support a conclusion that Bordwell was Wal–Mart's vice principal; consequently, his malice could not be imputed to Wal–Mart. We disagree. The evidence showed without dispute that Bordwell was authorized to manage the jewelry department. The definition of vice principal given in the charge expressly defined the term to include "a person ... who has the authority to manage ... a department of" the corporation's business. Moreover, un-

der the general instruction given in the initial part of the charge, the acts of an agent or employee of a corporation who acts within the scope of his delegated authority or duties as an employee or agent may bind the corporation. Wal–Mart does not complain about the charge. It is undisputed that Bordwell possessed delegated authority to manage the jewelry department and, in that connection, to direct and supervise Itz's work. In the course of doing so, Bordwell twice ordered Itz to a back room under a business pretext where Itz testified actionable conduct occurred. Thus, Bordwell's supervisory position aided him in committing wrongs under a business pretext. It is immaterial whether Bordwell possessed authority to discharge Itz or hire applicants. "[C]omplete authority to act on the employer's behalf without the agreement of others is not necessary to meet Title VII's agency standard for supervisor liability." *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 154–55 (3d Cir.1999). We overrule Wal–Mart's contention that the judgment for exemplary damages must be reversed because Bordwell was not shown to be a vice principal.

 In any event, the evidence was undisputed that Taber was a vice principal. Wal–Mart's own evidence showed he possessed authority to hire, discharge, and direct the employees at the south Austin store and to manage that store. Any malice on Taber's part was thus imputable to Wal–Mart in determining exemplary damages. We believe a jury could reasonably find by clear and convincing evidence that Taber acted with malice toward Itz's rights.

---

4. The term "vice principal," as used in the instructions accompanying Question No. Ten, was taken from the opinions in *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997) and *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 406 (1934), *overruled on other grounds, Wright v. Gifford–Hill Co.,* 725 S.W.2d 712, 714 (Tex. 1987). These decisions set out rules governing the imposition of exemplary damages against a corporation for the acts or omissions of its officers, managers, and employees. Such damages lie only when the conduct may be said to be that of the corporation itself, rather than its ordinary servants or agents. *See Hammerly Oaks,* 958 S.W.2d at 391. The definition of vice principal given in the charge is consistent with the usage in *Hammerly Oaks. See Hammerly Oaks,* 958 S.W.2d at 392.

 Further, the alternative conduct inquired about in Question No. Ten—reckless indifference toward Itz's rights—was not restricted to a vice principal. This left the issue of reckless indifference to be determined under the general instruction requiring only that Taber act within the scope of his delegated authority and duties as store manager. We believe the jury could reasonably find by clear and convincing evidence that Taber's conduct—as well as Bordwell's conduct as manager of the jewelry department—constituted reckless indifference to Itz's rights.

It is undisputed that Taber had actual awareness of the risk posed by Bordwell's conduct—he received Itz's written complaints, Berg's complaint, and the gifts of a watch and money. Taber had previously been made aware of Bordwell's sexual harassment of Longoria and soon learned of Cantu's complaints. While conceding in Itz's case that Bordwell's conduct would constitute sexual harassment, Taber disbelieved that such conduct occurred because Bordwell denied it and no one else, save Berg, observed it. Taber was aware of Wal–Mart's written policy against sexual harassment and Itz's rights thereunder; Taber had authority and a duty to administer that policy. He necessarily had to have actual, subjective awareness of the risk involved in conduct prohibited by such policy and the attendant necessity to conduct an investigation commensurate with the seriousness of Itz's allegations. In our view a reasonable fact finder could conclude by clear and convincing evidence that Taber acted with conscious indifference to Itz's rights, safety, or welfare. Taber's investigation consisted of interviewing Itz and Bordwell and other employees who had *not* witnessed Bordwell's sexual harassment. Taber concluded he did not have enough "facts" to reach a conclusion of any kind, yet he admitted he nevertheless concluded Bordwell had *not* sexually harassed Itz and did not proceed further. He informed neither Bordwell nor Itz of his conclusions. He chose to communicate his willingness to transfer Itz through her boyfriend, if his own testimony is believed, rather than through a direct personal communication to Itz commensurate with the seriousness of her complaints. Finally, Taber refused to give Itz copies of her written statements without a subpoena.

Wal–Mart argues that, as a matter of law, neither Bordwell nor Taber were sufficiently high in its managerial hierarchy for Wal–Mart to be liable for exemplary damages, relying on *Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1323 (11th Cir.1999). *Dudley* holds, indeed, that a store manager such as Taber lacks sufficient authority "to allow [his] discriminatory acts to be the basis for punitive damages against the corporation." *Id.*

The rationale for the *Dudley* holding is that exemplary damages may be imposed only in an "egregious case." The requirement of "egregious" conduct has the purpose of assuring constructive notice to the "higher management" of the corporation—unless the discriminatory conduct is "egregious," it is insufficient to give the requisite constructive notice at the managerial level required to put the corporation itself on notice. "In short," the plaintiff in *Dudley* "failed to prove that Wal–Mart—the company—had the kind of notice and engaged in the kind of egregious acts required to award punitive damages." *Id.*

*Dudley's* requirement of sufficiently egregious conduct to alert higher management was expressly rejected by the United States Supreme Court in *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 2124, 144 L.Ed.2d 494 (1999). Moreover, the jury charge in the present case submitted the question of exemplary damages on a different principle, and Wal–Mart makes no complaint that such submission was error. *See San Jacinto River Auth. v. Duke,* 783 S.W.2d 209, 210 (Tex. 1990).

We hold that Wal–Mart was not entitled to a take-nothing judgment on exemplary

damages as a matter of law based on this higher management rationale.

### Whether Wal–Mart was insulated from exemplary damages by reason of its "good faith efforts to comply with Title VII"

■ Citing *Kolstad*, Wal–Mart contends that its written policies and grievance and training procedures insulated it. from liability for exemplary damages as a matter of law. *See Kolstad*, 527 U.S. 526, 119 S.Ct. at 2118. In *Kolstad*, the court held that employers in Title VII cases may be entitled to an affirmative defense against a claim for exemplary damages. *See id.* at 2125. In its decision, the court addressed the common law of agency concerning the recovery of exemplary damages from an employer based on an agent's action in Title VII cases.[5] The court held that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Id.* at 2129. Because *Kolstad* was decided more than a year after trial of this cause, Wal–Mart did not plead the affirmative defense mentioned therein. Consequently, neither party specifically directed evidence at the issue of whether Wal–Mart made "good-faith efforts to comply with Title VII," and no jury question was submitted in that regard.

The evidence is undisputed that Wal–Mart had a written policy forbidding sexual harassment and stating how episodes of forbidden conduct should be reported to management. Moreover, the evidence showed Wal–Mart had a regular program of training in the matter.

Wal–Mart argues that *Kolstad* established the proper legal standard for imputing liability to an employer in the punitive damages context. This is inaccurate. *Kolstad* did not establish something Itz had to *prove* or *disprove*, even if *Kolstad* controls here. *Kolstad* established an affirmative defense that an employer in Wal–Mart's position was required to plead and prove. *See Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 188 F.3d 278, 282 n. 2 (5th Cir.1999). We are not required to apply *Kolstad* retroactively, in all events. The decision merely settled the applicable law; it did not change the law. *See id.* at 282–84; *see also Jones v. Jones*, 888 S.W.2d 858, 860 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

We hold the evidence is legally and factually sufficient to support the award of exemplary damages.

### MENTAL ANGUISH

Question No. Nine asked and instructed the jury as follows:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Lorrelle [sic] Itz for her damages, if any?
>
> Consider the following elements of damages and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include any interest on any amount of damages you have found. To find "mental anguish" damages, there must be direct evidence of the nature, duration, or severity of Lorrelle [sic] Itz's alleged anguish, thus establishing a substantial disruption in her daily routine, or other evidence of a high degree of mental pain and distress that

---

5. Under the common law of agency, exemplary damages may properly be awarded against an employer because of an agent's act if (a) the employer authorized the doing of the act; or (b) the agent was unfit and the principal was reckless in employing him; or (c) the agent was employed in a managerial capacity and acting in the scope of employment; or (d) the employer or a managerial agent of the employer ratified or approved the act. *See* Restatement (Second) of Agency § 217C (1957). The same rules are set out in the Restatement of Torts section 909 (1939). The Supreme Court of Texas adopted section 909 of the Restatement of Torts in *King v. McGuff*, 149 Tex. 432, 234 S.W.2d 403, 405 (1950). *See Hammerly Oaks*, 958 S.W.2d at 391.

is more than mere worry, anxiety, vexation, embarrassment, or anger.

Do not include in your answer any amount that you find Lorelle Itz could have avoided by the exercise of reasonable care.

Answer in dollars and cents, if any, for each part:

ANSWER:

a. Psychological care expenses that, in reasonable probability, Lorelle Itz will incur in the future: ANSWER: $1,500

b. Past mental anguish: ANSWER: $50,000

c. Mental anguish that, in reasonable probability, Lorelle Itz will sustain in the future: ANSWER: $10,000

d. Past lost wages: ANSWER: $2,765.75

e. Loss of earning capacity that, in reasonable probability, Lorelle Itz will sustain in the future: ANSWER: 0

■ Wal–Mart contends the evidence is legally and factually insufficient to support the jury's verdict of $50,000 and $10,000 for past and future mental anguish. Alternatively, Wal–Mart contends the sums assessed are excessive.

The instruction given in the charge as to mental anguish is consistent with the requirements set out in *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442–45 (Tex. 1995). The decision in *Saenz v. Fidelity & Guaranty Insurance Underwriters*, 925 S.W.2d 607, 614 (Tex.1996) requires that the amount of damages awarded for mental anguish be fair and reasonable.

■ We note that damages for mental anguish are considered to be uniquely within the province of the fact finder because of the subjective nature of such injuries and the nature of the related testimony and evidence. *See Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 763 (Tex.App.—Corpus Christi 1988, writ denied); *Firestone Tire & Rubber Co. v. Battle*, 745 S.W.2d 909, 917 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

Wal–Mart recites parts of the relevant evidence and contends each part is, by itself, insufficient to support the jury findings. Reviewing all the relevant evidence and considering it in the aggregate, however, we believe the jury could reasonably find as it did here. We refer, for example, to the psychologist's unrebutted testimony that Itz suffered from depression, anxiety, and phobias at a rate exceeding that found in the normal population; that "she had more of those attributes than 95 percent of the population in the United States"; and that her anxiety, depression, and phobias "were caused or exacerbated by the sexual harassment episodes in the workplace."

We hold the evidence is legally and factually sufficient to support the jury's findings as to mental anguish damages and that the sums found are not excessive.

## RATIFICATION

■ In addition to her statutory causes of action for sexual harassment, Itz alleged a common law cause of action against Bordwell for assault, coupled with a claim that Wal–Mart was liable for her resulting injury because Wal–Mart ratified the assault.

In answer to Question No. Five, the jury found that Bordwell assaulted Itz, proximately causing her injury. In answer to Question No. Thirteen, the jury found by clear and convincing evidence that Wal–Mart ratified the assault.

Question No. Thirteen instructed the jury as follows:

Ratification occurs when a vice principal of Wal–Mart knew about the employee's acts, recognized that the employee's acts would continue if he was retained, did nothing to prevent the ongoing unlawful acts, and chose to retain the employee.

You are instructed that "clear and convincing evidence" means the measure or degree of proof that produces in your mind a firm belief or conviction as to the truth of the matter sought to be established.

You are instructed that to find that Wal–Mart ratified any act, you must find that a "vice principal" of Wal–Mart ratified the act and was acting within the course and scope of his or her employment.

A "vice principal" of a corporation is a person who has the authority to hire, discharge, and direct the employees of the corporation, or who has the authority to manage the entire corporation or a department or division of its business. You are instructed that "course and scope" means that the employee committing the act was acting within the scope of his general authority and the act was in furtherance of Wal–Mart's business and for the accomplishment of the object for which the employee was hired.

Wal–Mart contends the evidence is legally and factually insufficient to support the finding that Wal–Mart ratified Bordwell's assault. The company argues there is no evidence that Wal–Mart knew about Bordwell's acts but "did nothing to prevent the ongoing unlawful acts" as required by the instructions accompanying Question No. Thirteen. "To the contrary," Wal–Mart argues, "after Itz complained she was placed on leave and there was no further assaultive conduct that occurred between Bordwell and Itz"; and, Wal–Mart (through Taber and Phipps) offered to transfer Itz in order to separate her from Bordwell's conduct. We believe these contentions are unjustified inferences from the disputed and undisputed evidence.

Longoria testified Bordwell brushed her from behind, discussed her body with her, and hugged her several times in such a way that she could feel his "private parts." She reported this conduct to Taber in 1995 before Itz began working for Wal–Mart. Nevertheless, Bordwell was retained in Wal–Mart's employ. Around December 21, 1995, Itz complained to Rodrigues and Ghanem, both assistant store managers, about Bordwell's conduct, and ultimately gave Taber written statements describing the assaultive conduct. This is ample evidence that Taber, Wal–Mart's vice principal, knew of Bordwell's conduct. We therefore disagree with Wal–Mart's argument that there is no evidence Wal–Mart knew about Bordwell's acts.

Wal–Mart greatly overstates the evidence in its claim that the company offered to separate Itz from Bordwell by placing her "on leave" and giving her a transfer. The actual testimony was that Rodrigues told Itz not to report the *next working day* after giving her written statement to Rodrigues and Ghanem, and that Rodrigues would cover her shift on that working day. This was not placing Itz "on leave" in the extended sense implied by Wal–Mart. Ghanem told Itz she would have to continue working in the jewelry department when she did return to work. Taber told Itz he would look into the matter of a transfer, not that she could be transferred. Phipps left a message on Itz's answering machine that the previously arranged meeting had been canceled and that Itz should go to the north Austin store to see Donna Crocks. There is no evidence Itz was told she should ask Crocks for a transfer or discuss a transfer with her or that Phipps had arranged a transfer. While there is testimony that Taber told Itz's boyfriend she could transfer, there is no evidence that the boyfriend ever communicated that fact to Itz and no evidence that Taber told Itz that fact or that Itz even knew that her boyfriend met with Taber. Itz testified, on the other hand, that she did not know of such a meeting at all and her boyfriend never told her anything Taber said at such a meeting. The evidence is also uncontradicted that Wal–Mart never responded to letters sent by Itz's attorney requesting a transfer. Taber admitted that the first such letter was a response to his request that Itz "get back to him about a transfer." Under all the relevant evidence, we conclude the jury could reasonably find that Wal–Mart "did nothing" to prevent Bordwell's conduct.

We hold the evidence is legally and factually sufficient to support the jury's answer to Question No. Thirteen.

## ATTORNEYS' FEES

■ In answer to Question No. Fourteen, the jury found $122,058.75 to be a reasonable fee for the necessary services of Itz's attorneys, considering the following factors:

(1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;

(2) the likelihood that the acceptance of employment on this particular case precluded other employment by the attorneys;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or the uncertainty of collection before the legal services have been rendered.

Wal–Mart asserts generally that "[t]he attorney fee award is not supported by legally or factually sufficient evidence and is grossly disproportionate to the amount of recoverable damages." The argument is somewhat unclear.

To prove her attorneys' fees, Itz introduced in evidence two exhibits. Exhibit 25 consisted of a summary page, showing the charges made by six lawyers attached to thirty-seven pages of supporting documents describing the specific work done by each lawyer day-by-day and the time spent doing the work. Exhibit 26 related to the attorneys' time during trial.[6]

Douglass D. Hearne, one of Itz's attorneys at trial, testified that he had been licensed to practice law in Texas for forty years and had tried civil litigation cases since 1957. Itz first engaged Paul Morin who asked Hearne's firm to assist him in

---

6. Exhibit 25 showed on the summary page that Itz had accumulated the following charges between February 1, 1996, and March 26, 1998:

| | | |
|---|---|---|
| Paul T. Morin: 315.6 hrs at $150/hr | | $47,340.00 |
| Hearne, Eppright & Gest: | | |
| Douglass D. Hearne: | | |
| 60 hrs at $225/hr | $13,500.00 | |
| 27 hrs court time at $275/hr | 7,425.00 | 20,925.00 |
| Darrell D. Gest: 177.35 hrs at $165/hr | | 29,262.75 |
| Mary E. Jones: 1.35 hrs at $115/hr | | 189.00 |
| Roger B. Williams: 53.5 hrs at $115/hr | | 6,152.50 |
| J. Allen Halbrook: 1.0 hrs at $150/hr | | 150.00 |
| Law clerk and paralegals | | 7,419.50 |
| Total | | $111,438.75 |

The foregoing charges were documented in detail on thirty-seven attached pages describing the work done during each day and hour.

Exhibit 26 showed the work of the three lawyers (Hearne, Gest, and Morin) who tried the case in court on the last two days of trial. They calculated on the handwritten exhibit that each worked from 8:30 a.m. to 5:30 p.m. on the last two days, for a total of eighteen hours, then multiplied that number by $590.00, the aggregate of their hourly charges shown above. This produced a total of $10,620.00 for the last two days of trial.

Thus the sums on Exhibits 25 and 26 yield a total attorneys' fee of $122,058.75, the amount found by the jury in answer to Question No. Fourteen.

the preparation and trial of the case. Itz, Morin, and the Hearne firm agreed.

Hearne testified to the procedures followed by those in his firm in accounting for their work and the time spent doing it, as shown in Exhibit 25; Morin's work was also accounted for in Exhibit 25. Hearne testified that in his opinion the work set forth in Exhibit 25 was necessary and the charges therefore were reasonable, customary, and consistent with charges by other lawyers in Travis County in similar cases. As grounds for his opinions, Hearne discussed several of the eight factors in the charge. Hearne stated he had previously tried five sexual harassment cases but had no idea how many attorney Darrell Gest had tried. Beyond brief cross-examination, the evidence in Exhibits 25 and 26 and Hearne's testimony was not challenged or controverted in any respect.

Wal–Mart first contends that attorneys' fees are authorized only with respect to Itz's sexual harassment actions under the Texas Labor Code, which requires that such fees be reasonable. *See* Tex. Lab. Code Ann. § 21.259 (West 1996). Section 21.051 of the Code prohibits discrimination against an employee on the basis of sex. This encompasses Itz's actions for quid-pro-quo and hostile-work-environment sexual harassment. Because these causes of action are not supported by legally or factually sufficient evidence, Wal–Mart argues, Itz is not entitled to recover attorneys' fees. Because we have previously sustained the legal and factual sufficiency of the evidence respecting these causes of action, we overrule Wal–Mart's first contention.

Wal–Mart contends alternatively that the amount found by the jury is "not supported by sufficient evidence and is excessive considering the lack of evidence to support a sexual harassment claim, the jury's findings as a whole, and the total

damages available after rejecting the non-recoverable amounts." Because we may not understand exactly what is intended in this respect, we will set out Wal–Mart's argument in full. It contends:

> Although Itz's counsel testified as to the amount of fees incurred and to their reasonableness and necessity, the fee bills introduced contained numerous duplicate entries which are not justified. For example, all three of Itz's lawyers (including Mr. Morin, who was only a referring attorney)[7] billed time for the depositions of both Itz and Bordwell.... This is a simple sexual harassment case and it was unnecessary for three separate lawyers to duplicate their work. It was also unnecessary for all three of them to appear at trial.

Wal–Mart did not produce testimony controverting the reasonableness or necessity of the attorneys' fees proved by Itz's attorneys. Apparently, Wal–Mart contends that Itz's three lawyers duplicated each other's services as a matter of law. We find no basis for this contention in the record. The argument is not proven as a matter of law simply because all three attorneys attended the trial and two depositions. Wal–Mart was free to cross-examine Hearne or offer evidence in support of its contention. Wal–Mart did not do so. It further argues:

> The award [of attorneys' fees] is also unjustified in light of the relief to which Itz is entitled. Attorney's fees must be reasonable and necessary and bear some relationship to the amount recovered. [Citations omitted.] The jury's $122,000 award of attorney's fees is excessive in amount in light of the relief obtained and the value of the case. The Fifth Circuit has cautioned against awarding excessive attorney's fees, in cases where they are statutorily available, when the amount awarded as fees is dispropor-

---

**7.** The evidence shows that Morin was *not* merely "a referring attorney," contrary to Wal–Mart's statement.

tionate to the recovery attained. [Citations omitted.] This principle applies here.

Because no evidence controverts the reasonableness and necessity of the fees proven by Itz's attorneys, if we understand Wal–Mart's argument correctly, we are left to decided whether the amount of fees assessed by the jury is unreasonable as a matter of law in comparison to the amount of damages recovered for Itz.

█ Itz recovered a total sum of $232,330.18 plus post-judgment interest. The amount found by the jury for attorneys' fees was $122,058.75. Among other factors, the jury was expressly instructed to consider "the amount involved and the results obtained." In general, "the reasonableness of attorney's fees, the recovery of which is authorized by ... statute is a question of fact for the [trier of fact]." *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

The jury assessed attorneys' fees of less than half the damages Itz recovered, but that factor alone is not dispositive. We should consider the entire record in light of the factors in the charge and the common knowledge and experiences of lawyers and judges.

We have reviewed the record of the two week trial and disagree with Wal–Mart's assessment that "[t]his is a simple sexual harassment case." Nothing suggests a want of reasonableness or necessity in the work performed by Itz's attorneys or in the amount of attorneys' fees assessed by the jury. We find no basis for holding the attorneys' fees award disproportionate as a matter of law to the $232,330.18 Itz recovered. We therefore hold the attorneys' fees award is supported by legally and factually sufficient evidence.

Finding no reversible error, we affirm the trial court judgment.